1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EXXONMOBIL OIL CORP.,**<br><br>            **Plaintiff,**<br><br>  **v.**<br><br>**NICOLETTI OIL, INC., et al.**<br><br>            **Defendants.** | **1:09-cv-01498-OWW-DLB**<br><br>**MEMORANDUM DECISION ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT (Doc. 36)** |

## I.   INTRODUCTION

Plaintiff Exxonmobil Oil Corp. ("Plaintiff") is proceeding with an action pursuant to the Resource Conservation and Recovery Act (42 U.S.C. § 6972(a)(1)(B)) against Defendants Nicoletti Oil, Inc., Dino J. Nicoletti, and John A. Nicoletti.   In addition to asserting federal claims against Defendants, Plaintiff asserts several state law causes of action.

On May 18, 2010, the court issued a memorandum decision explaining pleading deficiencies which required certain of Plaintiff's claims to be dismissed; these claims were dismissed without prejudice on May 27, 2010.   (Docs. 30, 32).

Plaintiff filed a second amended complaint ("SAC") on June 7, 2010.   (Doc. 34).   Defendants filed a motion to dismiss ("motion to dismiss") the SAC on June 22, 2010.   (Doc. 36).   Plaintiff filed

**1**

1    opposition ("opposition") to Defendant's motion to dismiss on
2    August 30, 2010. (Doc. 40). Defendant's filed a reply on September
3    7, 2010. (Doc. 43).

### II. **FACTUAL BACKGROUND**.

5        Plaintiff is a New York corporation in the business of
6    producing, distributing, and selling petroleum products. (SAC at
7    3). Plaintiff's predecessor, General Petroleum Corporation,
8    purchased 2801 Blossom Street in Dos Palos, California in January
9    1946. (SAC at 4).

10       From 1946 to 1950, Dino J. Nicoletti operated a fuel
11   distribution plant at 2801 Blossom street as a distributor for
12   General Petroleum Corportation. (SAC at 4-5). From 1950 to 1980,
13   Dino Nicoletti operated 2801 Blossom Street as a cosignee of
14   General Petroleum Corporation and then Mobil Oil Corporation. (SAC
15   at 5). Mobil Oil Corporation was also Plainitff's predecessor.
16   (SAC at 5). On or about August 25, 1980, Dino Nicoletti and his
17   wife Floretta Nicoletti purchased 2801 Blossom Street from Mobil
18   Oil Corporation. (SAC at 5). On or about December 5, 1996,
19   ownership of 2801 Blossom Street was transferred to Dino Nicoletti
20   and Floretta Nicoletti as Trustees under the Dino J. Nicoletti and
21   Florretta A. Nicoletti Revocable Living Trust. (SAC at 5).

22       Defendants have operated and continue to operate a gasoline
23   and diesel sales and distribution facility at 2801 Blossom Street.
24   (SAC at 5). Nicoletti Oil, Inc. ("Nicoletti Oil") was incorporated
25   in California on or about January 1, 1982. (SAC at 6). Dino
26   Nicoletti served as an officer of Nicoletti Oil throughout the
27   1980's and currently serves as the company's Vice President. (SAC
28   at 6). John A. Nicoletti currently serves as the President of

**2**

1 Nicoletti Oil, a position he has held since as early at 1990.

2 (SAC at 6).  Cindy Nicoletti serves as the Secretary-Treasurer of

3 Nicoletti Oil.  (SAC at 6).  The FAC alleges that 100% of the

4 capital stock of Nicoletti Oil is owed by John A. Nicoletti and

5 Cindy Nicoletti.  (SAC at 6).

6     In or about 1998, Defendants purchased a lot adjacent to 2801

7 Blossom Street from Suburban Propane and installed new diesel

8 dispensers on the parcel; the SAC alleges that Nicoletti Oil, Inc.,

9 is the owner of the former Suburban Propane property.  (SAC at 5-

10 6).  Together, 2801 Blossom Street and the adjacent lot purchased

11 by Defendants in 1998 form the property at issue in this action

12 ("Property").  (SAC at 5). The Property is located directly across

13 the street from a residential area.  (SAC at 6).

14     Following the sale of 2801 Blossom Street in 1980, Plaintiff

15 or its predecessors entered into a series of wholesale distributor

16 contracts ("Contracts") with Nicoletti Oil, Inc., pursuant to which

17 Nicoletti Oil agreed to purchase a certain quantity of gasoline,

18 diesel fuel, and lubricant products.  (SAC at 7).  Such contracts

19 include, but are not limited to, a Wholesale Distributor Agreement

20 for Motor Fuels, dated May 6, 1985 ("1985 Agreement") and a

21 Wholesale Distributor Agreement (Lubricants, Distillates and other

22 Non-Motor Fuels) dated March 1, 1989 ("1989 Agreement").  (SAC at

23 7).  The parties to the Contracts intended the Contracts to bind

24 Plaintiff (or its predecessors) and Nicoletti Oil.  (SAC at 7).

25     Plaintiff alleges that during Nicoletti Oil's ownership of the

26 Property and operation of its businesses, releases of petroleum and

27 petroleum substances, including methyl tertiary butyl ether

28 ("MTBE"), have occurred on and migrated off of the Property.  (SAC

**3**

1  at 7-8). The SAC states that Nicoletti Oil detected a release of
2  petroleum hydrocarbons at the property in 1988. (SAC at 7-8). On
3  or about May 17, 1991, in response to the 1988 release, the Merced
4  County Department of Public Health issued a Notice and Order to
5  Nicoletti Oil and Mobil Oil Corporation that required investigation
6  of soil and groundwater contamination at the Property. (SAC at 8).

7      On or about August 24, 1992, Mobil Oil Corporation and
8  Nicoletti Oil entered into a Cost Sharing Agreement wherein the
9  parties agreed that Nicoletti Oil would contract directly with the
10 contractors performing the investigative work required by the
11 Merced County Department of Public Health. (SAC at 8-9). The Cost
12 Sharing Agreement provided that, unless terminated beforehand, it
13 remained in effect until Nicoletti Oil's contractor submitted the
14 Site Contamination Workplan ("SCW"), Preliminary Investigation and
15 Evaluation Report ("PIER") and, if needed, a Problem Assessment
16 Report ("PAR") in final form to the Merced County Department of
17 Public Health. (SAC at 9). The Cost Sharing Agreement provided
18 that Mobil Oil Corporation and Nicoletti Oil would each pay 50% of
19 the costs for the preparation of the SCW, the PIER, and, if needed,
20 the PAR. (SAC at 9). The Merced County Department of Public
21 health required submission of a PAR in 1993, however, Nicoletti
22 Oil's contractors failed to complete or submit a PAR. (SAC at 9).

23     In 2001, Plaintiff learned of Nicoletti Oil's failure to
24 comply with outstanding directives from the Merced County
25 Department of health and began conducting investigation at the
26 Property as requested by overseeing agencies. (SAC at 9).
27 Plaintiff's investigation included onsite and offsite borings, soil
28 and groundwater analysis, installing monitoring wells, and

**4**

monitoring analytical data, among other tasks.  (SAC at 9).

On or about February 3, 2005, the Regional Board issued Cleanup and Abatement Order No. R5-2005-0701, naming both Nicoletti Oil and Plaintiff jointly as the "Discharger," without attempting to allocate their relative liability for the  contamination or assigning responsibility for cleanup at or around the Property ("2005 CAO").  (SAC at 9-10).  The 2005 CAO required the development and implementation of an interim remedial action plan, further site assessment of soil vapor migration, and submission of a full corrective action plan, including a human health risk assessment.  (SAC at 10).  Plaintiff complied with the 2005 CAO in December 2005.  (SAC at 10).  At the direction of the Regional Board, Plaintiff issued precautionary notices to the residents near the Property warning against on-site excavation or the digging of holes greater than a few feet deep on their properties and against the consumption and distribution of produce grown in the neighborhood.  (SAC at 10).  Plaintiff also distributed air filtration units, free of charge, to those residents who chose to use them as a precaution against vapor intrusions from the subsurface plume.  (SAC at 10).

The Regional Board rescinded the 2005 CAO and issued a new CAO in July 2006.  (SAC at 10-11).  Plaintiff continues to operate and maintain the remedial system at the Property pursuant to the terms of the 2006 CAO.  (SAC at 11).  Nicoletti Oil continues to operate its business and benefit from the remediation operated and maintained by Plaintiff, but does not contribute to or participate in the remedial effort.  (SAC at 11).  Plaintiff alleges that Nicoletti Oil's ongoing operation of the plant at the Property has

**5**

1   resulted in further unauthorized releases of contaminants, which
2   undermine and threaten to prolong Plaintiff's remedial efforts
3   under the 2006 CAO. (SAC at 11).

4       Plaintiff alleges that its consultants, who visit the Property
5   on a regular basis in order to maintain the remedial system, have
6   repeatedly observed and documented surface releases of petroleum in
7   the area of Nicoletti Oil's fuel dispensers. (SAC at 11). Since
8   2006, Plaintiff has requested integrity testing of Nicoletti's fuel
9   system, but Nicoletti refuses to perform such testing or to allow
10  Plaintiff to perform testing. (SAC at 12).

11      In March 2008, Plaintiff's consultants detected a new release
12  of diesel fuel at the Property when the on-site remedial system was
13  overwhelmed by a substantial volume of fresh red-dye diesel
14  product; Plaintiff alleges that this new release could have been
15  prevented had Defendants conducted adequate testing to assure the
16  integrity of its fuels system. (SAC at 12). Plaintiff further
17  alleges that Nicoletti's own personnel and physical leak detection
18  systems failed to detect the release. (SAC at 12).

19      At Plaintiff's insistence, the Regional Board requested that
20  Plaintiff propose a scope of work for more comprehensive testing of
21  the entire fuel system, and Plaintiff submitted such a scope, which
22  it proposed to be completed (at Plaintiff's expense) by a third
23  party contractor acceptable to Nicoletti and the Regional Board.
24  (SAC at 13). The Regional Board approved Plaintiff's scope of
25  work. (SAC at 13). Nicoletti declined to allow the further
26  testing of the fuel system proposed by Plainitff and approved by
27  the Regional Board. (SAC at 13). Instead, Nicoletti Oil
28  subsequently submitted its own less complete fuels system testing

**6**

1   scope of work, dated April 24, 2009, which it proposed to conduct
2   using its own contractors, and which the Regional Board
3   subsequently approved.   (SAC at 13).

4       Nicoletti's contractors and/or subcontractors commenced fuel
5   system tightness testing, per Nicoletti Oil's scope of work, on
6   June 1, 2009. (SAC at 13).  However, Nicoletti could not proceed
7   with portions of the system testing because some or all of the
8   components on both the gasoline and diesel systems were in such a
9   state as to be incapable of retaining liquid, and therefore could
10  not be tested for tightness.  (SAC at 13).

11       Nicoletti subsequently completed fuel system upgrades and/or
12  replacements and performed fuel system testing. (SAC at 14).  The
13  SAC alleges that during the upgrading of Nicoletti Oil's systems,
14  stained soil was observed on the former Suburban Propane property.
15  (SAC at 14).

16       Plaintiff alleges that the releases of petroleum product from
17  Defendant's operation are contrary to applicable regulations and
18  industry standards of operation for petroleum facilities, and that
19  there is a continuing risk of new releases of petroleum product
20  from Nicoletti's operations. (SAC at 14).  Plaintiff contends that
21  Nicoletti's releases from the Property may present an imminent and
22  substantial endangerment to health or the environment, and that the
23  majority, if not all, of the contamination being remediated at or
24  near the Property is of a fuel type and in a location that cannot
25  be attributed to any ownership or conduct of Plaintiff. (SAC at
26  15).

27  ///

28  ///

**7**

### III.  LEGAL STANDARD

Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In other words, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted).

The Ninth Circuit has summarized the governing standard, in light of *Twombly* and *Iqbal*, as follows: "In sum, for a complaint to survive a motion to dismiss, the nonconclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir.2009) (internal quotation marks omitted). Apart from factual insufficiency, a complaint is also subject to dismissal under Rule 12(b)(6) where it lacks a cognizable legal theory, *Balistreri*, 901 F.2d at 699, or where the allegations on their face "show that relief is barred" for some legal reason, *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct.

**8**

1   910, 166 L.Ed.2d 798 (2007).

2   ///

3       In deciding whether to grant a motion to dismiss, the court

4   must accept as true all "well-pleaded factual allegations" in the

5   pleading under attack. *Iqbal*, 129 S.Ct. at 1950. A court is not,

6   however, "required to accept as true allegations that are merely

7   conclusory, unwarranted deductions of fact, or unreasonable

8   inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

9   (9th Cir.2001). "When ruling on a Rule 12(b)(6) motion to dismiss,

10  if a district court considers evidence outside the pleadings, it

11  must normally convert the 12(b)(6) motion into a Rule 56 motion for

12  summary judgment, and it must give the nonmoving party an

13  opportunity to respond." *United States v. Ritchie*, 342 F.3d 903,

14  907 (9th Cir.2003). "A court may, however, consider certain

15  materials-documents attached to the complaint, documents

16  incorporated by reference in the complaint, or matters of judicial

17  notice-without converting the motion to dismiss into a motion for

18  summary judgment." *Id*. at 908.

19                    **IV.  DISCUSSION**

20  **A. Plaintiff's Claim for Express Contractual Indemnity**

21      To state a cause of action for breach of contract, a party

22  must plead the existence of a contract, his or her performance of

23  the contract or excuse for nonperformance, the defendant's breach,

24  and resulting damage. *E.g. Harris v. Rudin, Richman & Appel*, 74

25  Cal. App. 4th 299, 307 (Cal. Ct. App. 1999). In order to satisfy

26  federal pleading standards,

27          a plaintiff must describe the alleged terms of the
            contract in a sufficiently specific manner to give the
28          defendant notice of the nature of the claim. For example,

**9**

a claim on a written contract must either (1) quote relevant contractual language; (2) include a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect.

*Kirbyson v. Tesoro Ref. & Mktg. Co.*, 2010 U.S. Dist. LEXIS 18174 * 26 (N.D. Cal. 2010) (citing *Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 362 F. Supp. 2d 744 (N.D. Tex. 2005)).

The SAC is sufficient to plead breach of contract claims regarding the indemnity provisions of the Wholesale Distributor Agreement for Motor Fuels dated May 6, 1985 and the Wholesale Distributor Agreement for Lubricants, Distillates, and other Non-Motor Fuels dated March 1, 1989.  Although the SAC also contains sufficient factual information to state a claim for breach of the cost-sharing agreement entered into on or about August 24, 1992, this agreement is not mentioned in the section setting forth Plaintiff's breach of contract cause of action. (SAC at 21-24). Accordingly, the SAC fails to give Defendants fair notice of whether Plaintiff seeks to assert a breach of the 1992 cost-sharing agreement.  To the extent Plaintiffs seek to assert claims for breach of contracts other than the May 6, 1985 and March 1, 1989 agreements, the SAC fails to give Defendants fair notice of such claims.  Defendants' motion to dismiss Plaintiff's breach of contract claims is DENIED as to the May 6, 1985 and March 1, 1989 agreements and is GRANTED to any other contractual claims. Plaintiff will be given one more opportunity to properly plead additional claims.

**B. Plaintiff's Negligence Claim**

Generally, there is no duty to prevent economic loss to third parties in negligence actions at common law.  *Greystone Homes, Inc.*

**10**

1  *v. Midtec, Inc.*, 168 Cal. App. 4th 1194 , 1216 (Cal. Ct. App. 2008)

2  (citing *Ratcliff Architects v. Vanir Construction Management, Inc.*,

3  88 Cal. App. 4th 595, 605 (Cal. Ct. App. 2001)).   However, a

4  special relationship between two parties may impose on each a duty

5  to exercise ordinary care in the avoidance of economic injury to

6  the other. *See, e.g., Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App.

7  4th 1439, 1448-49 (Cal. Ct. App. 1995).   Existence of a special

8  relationship depends on "(1) the extent to which the transaction

9  was intended to affect the plaintiff, (2) the foreseeability of

10 harm to the plaintiff, (3) the degree of certainty that the

11 plaintiff suffered injury, (4) the closeness of the connection

12 between the defendant's conduct and the injury suffered, (5) the

13 moral blame attached to the defendant's conduct and (6) the policy

14 of preventing future harm." *E.g. J'Aire Corp. v. Gregory,* 24 Cal.

15 3d 799, 804 (Cal. 1979)*.*  Plaintiff contends that the CAO orders

16 imposed a special relationship between Plaintiff and Defendants.

17     The intent factor entailed by the *J'Aire* test does not require

18 an intent to injure.   *See Ales-Peratis Foods Internat. v. Am. Can*

19 *Co.*, 164 Cal. App. 3d 277, 289-290 (Cal. Ct. App. 1985).   In *Ales-*

20 *Peratis Foods,* the Court of Appeal reasoned:

21     The contract between Gencan and American Can was for
       supplying cans necessary to the execution of Ales-Peratis
22     contract.   The performance of the contract directly
       affected appellant's ability to fully and timely perform
23     its contract with its customer, and AP alleged both
       Gencan and American knew this.   The record of the
24     conversation between the agents for Gencan and American
       Can shows they both knew AP needed and had requested a
25     specific type of can suitable for packing a certain type
       of seafood.   Furthermore, American Can's practice of
26     supplying dealers should have alerted it to the fact any
       breach on its part could foreseeably lead to a lost
27     business opportunity and thereby lost profits on the part
       of AP. Thus American Can's performance was intended to,
28     and did directly affect Ales-Peratis.

**11**

1

2    *Id*.  Here, Defendants were aware that past operations on the

3    Property had resulted in contamination, and that continued

4    operations could result in more contamination absent appropriate

5    measures.  Defendants were also aware that Plaintiff and Defendants

6    shared an obligation under the CAO's to remediate contamination at

7    the Property, and that further contamination of the Property would

8    impede compliance with the CAO's. As in *Ales-Peratis*, Defendants'

9    alleged conduct directly affected Plaintiff's ability to perform

10   legal obligations that Defendants were fully aware of.   The

11   allegations contained in the SAC satisfy the intent and

12   forseeability elements under the *J'Aire* test.

13        The third factor under the *J'Aire* test– the degree of

14   certainty that Plaintiff has suffered injury– is sufficiently pled

15   in the SAC.  To the extent Defendants have caused additional

16   contamination of the Property, Plaintiff has been injured, because

17   the CAO's obligate Plaintiff to remediate contamination at the

18   Property.  The moral blame factor under *J'Aire* also weighs in favor

19   of imposing a special relationship between the parties.  According

20   to the facts alleged in the SAC, at a minimum, Defendants

21   negligently allowed contamination to occur with knowledge that such

22   contamination would harm both Plaintiff and the community

23   surrounding the property.  Finally, it is axiomatic that the policy

24   of preventing future harm also weighs in favor of imposing a

25   special relationship under the circumstances.

26        The SAC is sufficient to allege the existence of a special

27   relationship between Plaintiff and Defendants under the *J'Aire*

28   test.  The SAC also sufficiently alleges that Defendants breached

**12**

the duty entailed by their special relationship with Plaintiff, and that Plaintiff was injured as a result of Defendants' breach of duty.  Defendants' motion to dismiss Plaintiff's negligence claim is DENIED.

**V.  <u>CONCLUSION</u>**

For the reasons stated, IT IS ORDERED:

    1)    Defendants' motion to dismiss Plaintiff's breach of contract claim is DENIED as to the Wholesale Distributor Agreement for Motor Fuels dated May 6, 1985 and the Wholesale Distributor Agreement for Lubricants, Distillates, and other Non-Motor Fuels dated March 1, 1989, and is GRANTED without prejudice as to all other contract claims;

    2)    Defendants' motion to dismiss Plaintiff's negligence claim is DENIED; and

    3)    Plaintiff shall lodge a formal order consistent with this decision within five (5) days following electronic service of this decision by the clerk.  Plaintiff shall file an amended complaint within fifteen (15) days of the filing of the order.  Defendant shall file a response within fifteen (15) days of receipt of the amended complaint.

IT IS SO ORDERED.

**Dated:    September 22, 2010**          **/s/ Oliver W. Wanger**
UNITED STATES DISTRICT JUDGE

**13**